UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 10-CR-0049 (PJS/JJK) |
| Plaintiff, | |
| v. | ORDER |
| RODNEY DARNELL FOSTER, | |
| Defendant. | |

Kevin S. Ueland, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Jill Clark, JILL CLARK, P.A., for defendant.

A jury found defendant Rodney Foster guilty of unlawfully possessing a firearm and ammunition. Foster moves for reconsideration of the Court's order denying his pretrial motion to suppress evidence of the firearm and ammunition. Foster also moves for a judgment of acquittal notwithstanding the verdict.

For the reasons that follow, the Court agrees with Foster that he and the car in which he was a passenger were searched in violation of the Fourth Amendment, and therefore the critical evidence in the case — a handgun and a magazine containing ammunition for the handgun — must be suppressed. With these two items of evidence excluded, there is insufficient evidence to convict Foster. The Court therefore grants Foster's motion for a judgment of acquittal notwithstanding the verdict.

I. BACKGROUND

Foster was arrested for unlawfully possessing a firearm and ammunition in the early morning hours of May 31, 2010, after two Minneapolis police officers pulled over a car in which

Foster was a passenger and found a magazine containing ammunition in Foster's pocket and a loaded gun under Foster's seat.  A grand jury indicted Foster in March 2010 for violating 18 U.S.C. § 922(g)(1), which prohibits a felon such as Foster from possessing a firearm or ammunition.

Foster moved to suppress the magazine and the gun, contending that the police obtained both items through searches that violated Foster's right under the Fourth Amendment to be free from unreasonable searches and seizures.  Magistrate Judge Jeffrey J. Keyes held an evidentiary hearing on Foster's motion to suppress on April 5, 2010, and Officer Mark Bohnsack testified about the events surrounding Foster's arrest.  Judge Keyes found Bohnsack's testimony credible and issued a Report and Recommendation ("R&R") in which he found that the challenged search was lawful and recommended denying Foster's suppression motion.

Foster objected to the R&R.  After considering Foster's objection, the government's response, and the transcript and exhibits from the suppression hearing, the Court agreed with Judge Keyes, adopted the R&R, and denied Foster's suppression motion.

Foster then went to trial.  At trial, Bohnsack again testified about the events that led to Foster's arrest, and Bohnsack's partner, Officer John Ochs, testified for the first time.  Observing their testimony, and focusing on other evidence, the Court began to doubt the correctness of its earlier order adopting Judge Keyes's R&R and denying Foster's suppression motion.

The Court informed the parties of its doubts outside of the presence of the jury.  Tellingly, though, the jury seemed to share the Court's doubts about the lawfulness of the searches, as evidenced by a set of questions that the jury asked the Court during deliberations.  Docket

No. 75. Once the Court instructed the jury that it should not consider the lawfulness of the searches, the jury promptly returned a guilty verdict.

After the jury returned its verdict, Foster renewed his earlier suppression motion and moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The Court held an evidentiary hearing on Foster's motions on August 6, 2010.

## II. DISCUSSION

### A. Legal Principles

When a defendant contends that the government obtained evidence in violation of the Constitution, the government must prove by a preponderance of the evidence that the challenged evidence is admissible. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *United States v. Matlock*, 415 U.S. 164, 178, n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."); *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (holding that when a defendant seeks to exclude a confession that he contends was involuntary, "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary").

Foster challenges the lawfulness of three things that led to his arrest: the traffic stop, the search of his person, and the search of the automobile in which he was riding. The following principles of Fourth Amendment law are relevant to these challenges:

*First*, "a police officer who observes a traffic violation has probable cause to stop the vehicle and its driver." *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Indeed, a police officer may conduct a traffic stop whenever he observes a traffic violation even if the traffic stop is pretextual — that is, even if the officer's real reason for making the stop is not to cite the driver for the observed traffic violation, but instead to investigate some other crime. *Whren*, 517 U.S. at 813 (rejecting "argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved").[1]

*Second*, if a police officer has made a lawful traffic stop, he may, as a matter of course, order the occupants out of the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop."); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

*Third*, during a traffic stop, a police officer may not conduct a patdown search of an individual unless the officer "harbor[s] reasonable suspicion that the person subjected to the frisk

---

[1] Even if an officer does not observe a traffic violation, he may conduct an investigative traffic stop if particularized, objective information creates "a reasonable suspicion that criminal activity is afoot." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009). But the government does not argue that the traffic stop in this case — as distinct from the subsequent searches — was supported by reasonable suspicion of criminal activity.

is armed and dangerous." *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009). This reasonable-suspicion requirement for conducting a patdown search during a traffic stop is the same reasonable-suspicion requirement that applies to patdown searches of pedestrians under *Terry v. Ohio*, 392 U.S. 1, 30 (1968). *Johnson*, 129 S. Ct. at 784.

*Fourth*, during a traffic stop, a police officer may not conduct a protective search of the vehicle's passenger compartment unless the officer "possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21).

Importantly, the Fourth Amendment does not permit police to conduct routine, suspicionless searches of people or vehicles during traffic stops. *See Long*, 463 U.S. at 1049 n.14 ("We stress that our decision does not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop . . . ."). Indeed, as the Supreme Court recently held in *Arizona v. Gant*, even if a traffic stop leads to an arrest, the police may not automatically search the stopped vehicle. 129 S. Ct. 1710, 1723-24 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the

warrant requirement applies."). To the extent that the government argues otherwise in this case, the government is mistaken.[2]

*B. Facts*

Bohnsack and Ochs's account of the events surrounding Foster's arrest differs significantly from the account of Foster and his friend Lenetta Doughty, the owner of the gun found under Foster's seat. Further, the account of Martez Turner, who was driving the car that Bohnsack and Ochs pulled over, differs in an important respect from Foster's account. The Court first sets out the undisputed facts, then turns to the parties' differing accounts of the evening's events.

1. Undisputed Facts

Bohnsack and Ochs were on duty in North Minneapolis from late at night on May 30 through the early morning of May 31. Shortly after midnight, they were parked in a marked squad car in the parking lot of Winner Gas, a gas station on the corner of Lyndale Avenue North and West Broadway Avenue. Foster and a friend, Martez Turner, drove out of the parking lot in

---

[2]The government, in its initial response to Foster's suppression motion, asserted that "after [a] vehicle's occupants are removed from the vehicle an officer may conduct a limited protective search of the vehicle before releasing the vehicle's occupants." Gov't Resp. Def. Pretrial Mots. at 6 [Docket No. 21]. This assertion, standing alone, is inaccurate.

As the two cases that the government cited to support the assertion make clear, a police officer may conduct a protective search of a vehicle only if the officer has reasonable suspicion that the vehicle contains a weapon. *See United States v. Stachowiak*, 521 F.3d 852, 857 (8th Cir. 2008) ("[W]e hold the police officer had reasonable suspicion to believe Stachowiak was presently armed and dangerous and therefore determine his protective search [of the automobile] was justified."); *United States v. Shranklen*, 315 F.3d 959, 963 (8th Cir. 2003) ("[A]n officer does not violate the Fourth Amendment by conducting a search to protect the safety of himself or others so long as the officer has reasonable suspicion that the suspect poses a danger.").

a maroon Ford Taurus sedan and turned right (northbound) onto Lyndale, with Turner driving and Foster in the passenger seat.

Bohnsack and Ochs followed the Taurus along Lyndale in their patrol car for about seven blocks. While Bohnsack drove, Ochs ran the Taurus's license plate, and records showed that the registered owner (who, as it turned out, was neither Turner nor Foster) had an expired driver's license. In the vicinity of 27th Street and Lyndale, Bohnsack activated the squad car's emergency lights, thus signaling Turner to pull over. Both the Taurus and the squad car pulled over and stopped at the side of the road. The squad car's spotlights were shining on the Taurus.

Bohnsack approached the driver's side of the car with a flashlight in his hand. Ochs, also carrying a flashlight, approached the passenger's side. Bohnsack asked Turner to step out of the car. Bohnsack and Turner walked to the squad car, Bohnsack patted Turner down, and Turner took a seat in back. *See* April 5, 2010 Mot. Hr'g Def. Ex. 2. Meanwhile, Ochs stood next to the Taurus on the passenger side while Foster remained seated inside. Bohnsack then walked over to Ochs, and Bohnsack told Foster to get out of the car. Foster complied. Bohnsack then handcuffed and pat-searched Foster. Bohnsack discovered a magazine for a handgun in a pocket of Foster's pants. Foster told Bohnsack that the magazine belonged to his girlfriend.

Bohnsack placed Foster in the back of the squad car. Bohnsack searched the Taurus and discovered a handgun under the passenger seat. (Whether the handgun was visible before the search is in dispute, but there is no dispute that the handgun was in the car, and that Bohnsack found it.) After another police officer arrived with a camera, Bohnsack took a photograph that shows the handgun on the car's floor, with its butt end visibly protruding from under the

passenger seat. April 5, 2010 Mot. Hr'g Tr. at 29 [Docket No. 29]; April 5, 2010 Mot. Hr'g Def. Ex. 3.

### 2. Bohnsack and Ochs's Account

According to Bohnsack, he and Ochs began following the Taurus out of the Winner Gas parking lot because it left the lot without signaling a turn. April 5, 2010 Mot. Hr'g Tr. at 6. As they followed the Taurus, the officers noticed that it was illegally tailgating another vehicle. *Id.* at 7. The officers then activated the squad car's emergency lights and pulled the Taurus over. *Id.* at 7-8.

As Bohnsack approached on the driver's side of the Taurus and neared the back of the car, he saw Foster lean forward. *Id.* at 8. Bohnsack aimed his flashlight at the car's interior when he was beside the car, and he saw Foster holding what appeared to be a handgun in his left hand and placing the gun under his seat. *Id.* According to Bohnsack, "right away I motioned to [Ochs] . . . that I observed something . . . I kind of pointed to make sure that he knew." *Id.*

Ochs likewise testified that as he approached the car holding his flashlight, he saw Foster "lean over and place a handgun underneath the seat." Trial Tr. Excerpt at 93 [Docket No. 89]. Ochs was about a foot away from the passenger's side of the car when he saw this. *Id.* Ochs glanced at Bohnsack, and according to Ochs, "[Bohnsack] motioned to me — I think he actually said watch, watch him, and he was pointing at [Foster]." *Id*. at 94.

Ochs remained standing beside the car, with Foster inside, while Bohnsack escorted Turner to the squad car. *Id.* at 95. Bohnsack said that he took Turner out of the car first, leaving Ochs to watch Foster, to ensure that Turner could not drive off and lead the officers on a chase. April 5, 2010 Mot. Hr'g Tr. at 27.

### 3. Foster and Doughty's Account

Foster did not testify at trial, but he did testify at the post-trial evidentiary hearing. Foster denied that Turner was illegally tailgating anyone when Bohnsack and Ochs pulled over the Taurus. According to Foster, he and Turner were following some women whom they had met at the gas station. Foster did not know any of the women's names.

Foster denied having had a gun in his hand when Bohnsack and Ochs approached the Taurus, let alone placing the gun under his seat. Doughty testified at the pretrial motions hearing that she put the gun under the passenger seat of the Taurus earlier in the day, when she was driving to a firing range for target practice. April 5, 2010 Mot. Hr'g Tr. at 41-42. Later, when Doughty dropped off the Taurus for Foster's use, she forgot that she had placed the gun under the seat and left it in the car. *Id.* at 42.

According to both Foster and Doughty, Doughty called Foster some time before the traffic stop and told him that she had left her gun in the Taurus and wanted it back. *Id.* at 42-43. Doughty also told Foster that she had left a magazine in the car's glove compartment. Because Foster did not want Doughty coming to his location (he was at another woman's house), he offered to bring the gun and magazine to Doughty. Foster found the magazine in the glove compartment and put it in his pocket.

The Court did not find Foster to be a credible witness, and out-of-court statements by Foster and Doughty cast additional doubt on their story. In particular, during a phone call that Foster placed to Doughty from jail shortly after his arrest and that the government recorded, Doughty and Foster had the following exchange:

        Doughty:      . . . Where was the gun?

        Foster:        Oh. Under the seat.

        Doughty:      It was underneath you?

        Foster:        Yeah.

Post-trial Hr'g Gov't Exs. S1 & S1-T at 8. Doughty's question about the gun's location is inconsistent with her testimony that she put it under the seat of the car herself.

### 4. Turner's Account

At the post-trial hearing, the government played an audio recording of an interview of Turner by Sergeant Holly Marie Keegel that took place in July 2009. Post-trial Hr'g Gov't Exs. S3 & S3-T. In that interview, Turner said that when Bohnsack and Ochs stopped the Taurus, Turner and Foster were following a gang member named Cornelius. Turner said that before the police officers recovered the gun from underneath the passenger seat of the Taurus, he had not known that Foster had a gun in the car.

### C. Analysis

Foster challenges the lawfulness of the initial traffic stop, the patdown search that revealed his possession of the magazine, and the automobile search that revealed the handgun. With respect to the traffic stop, the Court stands by its earlier finding that Bohnsack and Ochs stopped the Taurus because they saw it tailgating. It is quite possible that the stop was pretextual — that is, that once the officers learned that the Taurus's registered owner had a suspended license, Bohnsack and Ochs looked for an excuse to pull the car over. But a pretextual stop is not unlawful, *Whren*, 517 U.S. at 813, and Bohnsack and Ochs need only establish by a preponderance of the evidence that they in fact observed a traffic violation before pulling the car

over. According to both Turner and Foster, they were following the car in front of them (although they differ as to why). Moreover, there is no dispute that Bohnsack and Ochs followed the Taurus for several blocks before pulling it over. These facts are consistent with the testimony of Bohnsack and Ochs that the Taurus was following a car too closely, and the Court credits their testimony on this point.

The Court cannot, however, find that the government has carried its burden of proving, by a preponderance of the evidence, that Bohnsack had the requisite reasonable suspicion to pat down Foster or to search the Taurus. Bohnsack and Ochs's account of the evening's events contains a number of implausible assertions. Although each of these implausible assertions, taken in isolation, might not cause the Court to find that the searches were unlawful, when the assertions are considered together and in context, the Court is not persuaded that the searches were supported by reasonable suspicion.

To begin with, even assuming that the handgun was on Foster's person (rather than under the seat) before the traffic stop, it is difficult to believe that Foster would not have placed the gun under his car seat, at the latest, when Bohnsack and Ochs activated their emergency lights and Turner began pulling over in response. Yet according to Bohnsack and Ochs, Foster waited to put the gun under his seat until Bohnsack and Ochs had exited their car and walked so close to the Taurus that they could see a gun in Foster's hand near the floor in front of the passenger seat. In other words, as Bohnsack and Ochs would have it, Foster did not hide the gun while the marked squad car followed the Taurus, when the emergency lights were activated, while Turner was pulling over in response to the emergency lights, while the officers were preparing to exit the squad car, or while the officers were walking over to the Taurus. Instead, Foster held onto the

-11-

gun until the *precise moment* when the officers' flashlights were illuminating the interior of the car so well that both officers could see a gun in his hand. This is hard to believe.

The government points out that Foster was drunk that night and says that he may not have been acting rationally. Gov't Mem. Resp. Def. Mot. Reconsider at 12-13 [Docket No. 85]. The Court agrees that it is possible that Foster's drunkenness caused him to delay placing his gun under the seat. But because something is possible does not mean that it is likely. The government must prove not just that Bohnsack and Ochs *possibly* had reasonable suspicion to pat down Foster and search the car; the government must prove that it was *more likely than not* that they did.

There are several other problems with the officers' account. Both officers swore that they saw a gun in Foster's hand as he reached between his legs to slide the gun under his seat. The interior of a Taurus sedan at night is dark, and the area beneath the passenger seat is darker still. It would be difficult for anyone to see what was happening on the floor in front of the passenger, especially given that the view into the car would be obstructed by the car seats and the bodies of Foster and Turner. Again, the officers claim to have seen the gun in Foster's left hand, when that hand was between Foster's legs and near the floor. It seems highly unlikely that both officers, approaching the Taurus from opposite directions, could have immediately happened upon an angle that allowed them to see past the car seats and past the torso of Foster (a stocky man, who was purportedly leaning forward) and between Foster's legs and to recognize a gun in Foster's hand.

Further, the photograph taken by Bohnsack of the gun under the passenger seat is not consistent with the officers' statements that they saw Foster placing the gun under his seat with

his left hand. That photograph shows the grip and a portion of the gun barrel protruding from underneath the far right-hand side of the car seat. April 5, 2010 Mot. Hr'g Def. Ex. 3. The grip is angled in such a way that if the gun had been in Foster's left hand when it was set down, Foster's hand would have been twisted unnaturally, particularly given how far he would have had to reach to place the gun in its odd location under the right-hand side of the seat rather than under the seat's middle, between his legs. Once again, it is within the realm of possibility that Foster set the gun down in this position with his left hand, but it is not likely.

The Court also finds it difficult to square Bohnsack's and Ochs's actions during the traffic stop with their assertion that they both saw a gun in Foster's hand as they approached the car. For one thing, at the moment that they spotted the gun in Foster's hand, the officers would not have known if Foster was leaning over to *hide* the gun or leaning over to *retrieve* the gun. All that they would have known — in the first second or two after spotting the gun — is that a man who was a couple of feet from them had a gun in his hand. According to the government's own expert witness on police practices, Sergeant Stuart Robinson,[3] a police officer's normal reaction to a situation in which a suspect is seen with a gun is to immediately draw a weapon and retreat to a safe place. Yet there is no evidence that *either* officer even flinched, much less stepped away and drew his own weapon. In other words, neither Bohnsack nor Ochs acted normally, if their testimony is to be believed.

Moreover, by their own testimony, neither Bohnsack nor Ochs informed the other that there was a gun in the car. Ochs testified that he glanced over at Bohnsack. Bohnsack testified

---

[3]Before the evidentiary hearing on Foster's post-trial motions, Foster moved to exclude Robinson's testimony. The Court orally denied the motion on the record at the hearing.

that he motioned to Ochs to watch Foster. Yet according to their testimony, despite having no way of knowing whether the other officer saw Foster's gun, Bohnsack and Ochs did not give each other any specific signal to indicate that there was a gun in the car.

More incredibly, if Bohnsack's testimony is to be believed, he walked Turner back to the squad car and left Ochs alone with Foster, even though Bohnsack knew that Foster had a gun within easy reach, and Bohnsack did *not* know whether Ochs was aware of that gun. It is difficult to comprehend how a police officer could leave his partner alone, in the dark, on a deserted street,[4] standing two or three feet away from a suspect who had a gun within easy reach, without knowing if his partner was aware of that gun.

Bohnsack and Ochs said that they chose to deal with Turner (the unarmed driver of the Taurus) prior to dealing with Foster (who had a gun within reach) because they wanted to avoid getting into a car chase. And they explained their seemingly low-key reaction to Foster's possession of a gun as a decision to act as if they were unaware that Foster had the gun in order to lull him into remaining calm — a decision that apparently each officer reached independently, in the first couple of seconds after seeing the gun. Yet the officers' choice to act as if they were ignorant of Foster's possession of the gun is hard to square with their testimony that they both shined their flashlights near Foster's hand while he still was clutching the gun. Presumably an ordinary person in Foster's position would have noticed two flashlights shining on the area where he was hiding the gun.

It is conceivable (if barely) that Bohnsack and Ochs decided, under the circumstances, and without discussing the matter, that it made sense for Ochs to stand watch alone over the

---

[4]Trial Tr. Excerpt at 107 (Ochs: "I did not see any other vehicles or people around.").

armed Foster while Bohnsack dealt with the unarmed Turner. But even Sergeant Robinson, the government's expert witness, conceded that Bohnsack's and Ochs's behavior, as they described it, deviated from what would normally be expected of police officers in their situation.

Bohnsack and Ochs's account of events is thus made up of a series of possible but improbable assertions. The government, recognizing the Court's concern about the plausibility of Bonhsack and Ochs's account, makes two arguments as to why, even if the Court does not credit some portion of the officers' testimony, the challenged evidence should not be suppressed.

First, the government argues that even if Bohnsack and Ochs did not see a gun in Foster's hand, they were entitled to pat him down because they saw him lean forward. Gov't Mem. Resp. Def. Mot. Reconsider at 14. The Court rejects this argument. As a factual matter, the Court is not persuaded that the officers did, in fact, see Foster lean forward as they approached the Taurus. As a legal matter, even if Bohnsack and Ochs did see Foster lean forward, this in and of itself would not provide reasonable suspicion to conduct a patdown search.

The government cites three cases to support its assertion that seeing Foster make what the government calls "furtive movements" — i.e., leaning forward and reaching toward the floor — in a "high-crime area during the middle of the night" provided Bohnsack and Ochs reasonable suspicion that Foster was armed and dangerous. *Id.* But only one of those three cases, *United States v. Stachowiak,* comes anywhere close to supporting the government's position.[5] 521 F.3d

---

[5]One case, *Arizona v. Johnson*, merely stands for the proposition that a police officer may order a person out of a lawfully stopped car and may, if the officer reasonably believes that the person is armed and dangerous, pat the person down. 129 S. Ct. at 786-87. A second case, *United States v. Shranklen*, rejected a challenge to an officer's search of a pouch found under a car seat because the car's occupant specifically asked for the pouch, it was partially hidden in the car, and it was large enough to hold a weapon. 315 F.3d 959, 963 (8th Cir. 2003) ("We find that it was reasonable for [the police officer] to search the pouch given that it could have held a

852 (8th Cir. 2008). *Stachowiak* involved a search of a driver based in part on the driver's furtive gesture, but the court did not hold that a furtive gesture alone provided reasonable suspicion for a patdown search. Rather, the court rejected a challenge to a patdown search's constitutionality in light of the police officer's "knowledge [that] Stachowiak was likely to be armed, *coupled with* the observation of his furtive gesture . . . ." *Id.* at 856 (emphasis added). Unlike the police officer in *Stachowiak*, Bohnsack and Ochs had no information to suggest that the passenger in the Taurus had a weapon.

North Minneapolis is indeed a high-crime area, but the vast majority of its residents, and the vast majority of those driving through it, are not criminals. The Court does not believe that when police see a person lean forward in a car that they have stopped — even if they have stopped the car late at night in a high-crime area — they have reasonable suspicion to believe that the person is armed and dangerous. There are simply too many alternative explanations for why a person would lean forward, such as to retrieve ID from a purse or backpack, or to move from a slouched to an upright position in the seat.

The government also makes an inevitable-discovery argument. According to the government, once Bohnsack and Ochs ordered Foster out of the car — something that, under *Maryland v. Wilson*, they were clearly entitled to do — they would have seen the gun in plain view on the floor of the Taurus, and that would have provided them reasonable suspicion to pat down Foster and search the car. Gov't Mem. Resp. Def. Mot. Reconsider at 14-15. This argument, however, requires the Court to accept the government's assertion that when Foster

---

weapon, that [the defendant] specifically asked for the pouch, and that the pouch was hidden in the car."). No similar circumstances are present in this case.

stepped out of the car, the gun was sticking out from beneath the car seat as depicted in the photograph of the car's interior discussed above. The Court cannot find, by a preponderance of the evidence, that the photograph accurately depicts the position of the gun when Foster stepped out of the Taurus. As the Court has already explained, the position of the gun cannot be squared with the officers' account of what they saw.

In sum, the Court cannot find, by a preponderance of the evidence, that Bohnsack and Ochs had reasonable suspicion to believe that Foster was armed and dangerous when Foster stepped out of the car at the officers' request. Accordingly, Bohnsack was not justified in conducting a patdown search of Foster. The Court therefore suppresses the magazine that was found in Foster's pocket. Further, because Bohnsack and Ochs would not have had any reason to search the interior of the Taurus if Bohnsack had not found the magazine on Foster's person, the Court suppresses the gun that was found in the Taurus. Without this evidence, no reasonable jury could find Foster guilty of unlawfully possessing a firearm or ammunition, and the Court therefore grants Foster's motion for a judgment of acquittal notwithstanding the jury's verdict.

One final matter: If the judgment of acquittal is vacated or reversed on appeal, the Eighth Circuit will have determined that this Court has erred in finding that the magazine and the gun should have been suppressed. In that event, there will be no need for a new trial, because the only basis for directing a verdict of acquittal is the Court's finding that the magazine and gun were obtained in violation of the Fourth Amendment. (The Court has no doubt that Foster is guilty of the crime charged, as the jury found.) Thus, in accordance with Fed. R. Crim. P. 29(d)(1), the Court finds that a new trial will not be necessary if the judgment of acquittal is later vacated or reversed. Rather, if the judgment of acquittal is vacated or reversed on appeal,

the Court — unless otherwise directed by the Eighth Circuit — will simply reinstate the jury's guilty verdict.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of defendant Rodney Foster [Docket No. 78] for reconsideration of the Court's suppression ruling is GRANTED.

2. The motion of defendant Rodney Foster to exclude the testimony of Sergeant Stuart Robinson [Docket No. 92] is DENIED.

3. The Court's order [Docket No. 35] adopting in part the April 9, 2010 R&R [Docket No. 26] of Magistrate Judge Jeffrey J. Keyes is VACATED IN PART as follows:

    a. The order is VACATED to the extent that it found facts, or adopted findings of fact in the R&R, that are inconsistent with this order; and

    b. The order is VACATED to the extent that it denied Foster's motion to suppress [Docket No. 16].

4. The motion of defendant Rodney Foster to suppress evidence [Docket No. 16] is GRANTED.

5. The motion of defendant Rodney Foster for a new trial [Docket No. 77] is DENIED.

6. The motion of defendant Rodney Foster for a judgment of acquittal notwithstanding the verdict [Docket No. 76] is GRANTED. Defendant Rodney Foster is found NOT GUILTY of the charges against him.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 27, 2010   s/Patrick J. Schiltz
                          Patrick J. Schiltz
                          United States District Judge